A. B. HERVEY, Jr., Comm'r of Revenues,
State of Arkansas v. AMF BEAIRD, INC.

5-5504                                          464 S. W. 2d 557

Opinion delivered March 15, 1971

*Lyle Williams, J. Victor Harvey, John F. Gautney, Walter Skelton* and *Dewey Moore, Jr.,* for appellant.

*Wright, Lindsey & Jennings,* for appellee.

JOHN A. FOGLEMAN, Justice. The Commissioner of Revenues contends that the chancery court erroneously granted summary judgment in favor of appellee AMF Beaird, Inc., a Delaware corporation, whose principal office is in Louisiana, for recovery of income taxes paid the State of Arkansas by it for the years 1964, 1965 and 1966. In the judgment, granted on appellee's motion in a suit by it to recover these taxes, the chancellor made the following findings:

1. Plaintiff timely filed, on February 8, 1969, amended returns requesting refunds of income tax paid for the calendar years 1964, 1965, and 1966. Defendant denied the requested refunds, and plaintiff timely sought review of that denial in this Court.

2. Defendant has presented no evidence in opposition to the affidavit, depositions, and exhibit submitted by plaintiff in support of its motion and supplement to motion for summary judg-

ment, and there is, therefore, no genuine issue as to any material fact.

3. Defendant is prohibited by the terms of 15 U. S. C. A. § 381 from levying an income tax on plaintiff for the years 1964, 1965, and 1966.

Appellant urges three points for reversal. He contends that the court erred (1) in holding that appellant had presented no evidence in opposition to the affidavit, depositions and exhibits submitted by appellee in support of its motion for summary judgment; (2) in granting summary judgment in spite of the existence of genuine issues as to material facts; and (3) in holding that appellant is barred from levying an income tax on appellee for the years in question by United States Public Law 86-272, 73 Stat. 555, 15 U. S. C. A. § 381. As we view the matter, the issues raised by these points are so interdependent and intertwined that they cannot well be treated separately, so we will discuss them collectively. The real issue raised by the pleadings is whether appellee is relieved from the payment of income taxes for the years in question by the provisions of the federal law above mentioned. The act, insofar as pertinent, reads as follows:

(a) No state, or political subdivision thereof, shall have power to impose, . . . a net income tax on the income derived within such State by any person from interstate commerce if the only business activities within such State by or on behalf of such person during such taxable year are either, or both of the following:

(1) the solicitation of orders by such person, or his representative, in such State for sales of tangible personal property, which orders are sent outside the State for approval or rejection, and, if approved, are filled by shipment or delivery from a point outside the State; and

(2) the solicitation of orders by such person, or his representative, in such State in the name

of or for the benefit of a prospective customer of such person, if orders by such customer to such person to enable such customer to fill orders resulting from such solicitation are orders described in paragraph (1).

(b) The provisions of subsection (a) of this section shall not apply to the imposition of a net income tax by any State, or political subdivision thereof, with respect to—

(1) any corporation which is incorporated under the laws of such State; or

(2) any individual who, under the laws of such State, is domiciled in, or a resident of, such State.

Appellee based its motion for summary judgment upon the pleadings, the depositions of Robert Carroll, Jr., Paul Downs and Clian Dearien and the affidavit of N. T. Adams. In response, appellant filed only a formal allegation that there was a genuine issue of material fact and a brief in which he argued that the business activities of appellee exceeded the mere solicitation of orders for sales of tangible property. Appellant relied upon disclosures in the depositions upon which appellee based its motion. These disclosures included the contracts between appellee and certain of those with whom it did business in Arkansas.

Carroll operates Carroll Building & Supply Company, a sole proprietorship in Murfreesboro, engaged in the building material and LP gas business. He sells LP storage tanks manufactured by Beaird. He makes payment for tanks sold each month either to its representative or directly to the company at its principal office in Louisiana. He never returned any equipment to Beaird unless it was damaged or defective. He said that AMF salesmen never did anything except take orders, check his inventory and accept payments. Carroll carried insurance on the equipment obtained from Beaird

while it was in his possession. He said that monthly sales were about equal to monthly orders. He stated, "As we sell a tank we pay for it." The contract between Carroll and Beaird, which could be terminated by either party upon 30 days' notice, contained the following pertinent provisions:

I.   That First Party shall consign to Second Party Beaird Standard LP-Gas domestic systems at Second Party's business location in Murfreesboro, Arkansas, and Second Party shall receive and accept possession of said systems upon the terms and conditions hereinafter stated:

II.  Shipments will be made by truck or rail at First Party's discretion, and all freight charged from First Party's plant to destination will be paid by First Party;

III. The prices at which Second Party shall buy said systems will be in accordance with a schedule to be furnished Second Party by First Party, and said prices will be subject to change by First Party at any time;

IV.  Second Party agrees to accept billing for all systems remaining in their consigned stock over twelve months;

V.   Second Party agrees that no consigned systems or other equipment will be used, sold or removed from its stock until cash payment for said systems or equipment has been made to First Party. Upon request of Second Party, giving serial number of systems sold, name and address of purchaser, First Party shall furnish State or local regulatory bodies and the customer the required data sheets. Second Party also agrees that parts will not be removed from systems in stock for any purpose without written approval from First Party.

Second Party agrees to store systems or other tank equipment in a manner which will hold them safe from fire, theft or other damages which may occur and to protect First Party against any liens, seizures, taxes, or other claims or privileges which might be made against said systems or First Party. Second Party, as consignee, especially assumes liability for and agrees to pay any state or local taxes levied on the consigned articles or their use or sale, or on the business growing out of the consignment of said systems;

VI. Second Party shall diligently promote the sale of First Party's systems and if, in the opinion of the First Party, any or all of said systems on hand at any time are slow of movement, then at the sole discretion of First Party, Second Party shall make disposition of said systems in accordance with written instructions directed to it by First Party. Any freight or hauling charge involved in such disposition shall be at the expense of First Party.

VII. During the terms of this contract Second Party agrees not to stock or sell LP-Gas systems manufactured by others than First Party.

Carroll stated that he used his own sales agreement forms, billed customers and extended credit at his own risk, without any dictation or suggestion or prices by Beaird, in spite of the contract provisions.

Downs operated Tobin Furniture & Butane Company, a corporation engaged in the LP gas and furniture business in DeQueen, under a contract similar to that with Carroll. Paragraph 4, however, in the Tobin contract, reads as follows:

IV. Second Party agrees to use systems shipped into consignment on a first-in first-out basis in order to avoid obsolete inventory, and fur-

thermore, Second Party agrees to remit for all systems remaining in their consigned stock over twelve (12) months.

This contract also contained an additional provision reading as follows:

If Second Party cancels the consignment agreement, he agrees to (a) either purchase the remainder of stock on hand at First Party's published list price as of date of cancellation, no cash discount, will be allowed; or (b) deliver the stock remaining in consignment to another consignment located as directed by First Party; or (c) return the stock remaining in consignment to the First Party's factory at Second Party's expense.

Downs followed practices similar to those of Carroll. He said that Beaird's salesman would come by, inventory his stock and collect for whatever merchandise he had sold.

Dearien operated Stone County Gas Company, a corporation in Mountain View, selling propane gas and appliances. The corporation acquired the business from O. H. Stevens, who was buying from Beaird. It continued the existing relationship with appellee. Stevens' contract with Beaird was virtually identical with that of Tobin. Dearien obtained tanks by placing an order, usually when Beaird's salesman called. He paid Beaird either at the end of a month or when the salesman came around and checked inventory. Otherwise, the method of operation was similar to those conducted with the other deponents. Dearien testified, "The property was on consignment and it was ours to handle any way we saw fit as long as we paid for it."

N. T. Adams was Beaird's sales representative at all times after June 1, 1951. He made monthly calls on Beaird's customers in Arkansas. He stated that his only duties in Arkansas were:

(a) To receive orders from the customer for transmittal to the home office in Shreveport, Louisiana, where the order is accepted or rejected.

(b) To check the customer's inventory of Beaird equipment.

He said that the customer paid Beaird each month for the merchandise sold by the customer during the preceding month. He added that Beaird did not intend to retain title to the equipment sold to its customers, took no action for this purpose, did not designate its customers as its agents and did not deal with them on that basis. He corroborated the deposing customers as to practices with reference to sales, credit extended, prices, etc.[1]

At the outset, we should say that we do not agree with the chancellor that the failure of appellant to offer evidence in opposition to the affidavit, depositions and exhibits submitted by appellee necessarily entitled the latter to summary judgment, or showed nonexistence of any genuine issue as to any material fact. See *Ashley* v. *Eisele,* 247 Ark. 281, 445 S. W. 2d 76. This is only the case when the moving party has clearly met its burden of demonstrating that there is no justiciable issue. The adverse party only has the burden of demonstrating the existence of such an issue when the moving party has made a prima facie showing of entitlement to the relief sought by it. See Ark. Stat. Ann. § 29-211 (e) (Supp. 1969); *Miskimins* v. *City National Bank of Fort Smith,* 248 Ark. 1194, 456 S. W. 2d 673. In determining whether the movant has made the requisite showing, all doubts are resolved against summary judgment, all presumptions and inferences must be resolved against the movant and, in a case in which fair-minded men may honestly differ about the conclusions to be drawn from the testimony, summary judgment must be denied. *Mason* v. *Funderburk,* 247 Ark. 521, 446 S. W. 2d 543. The evidence must be liberally construed in favor of the party opposing the motion. *Pickens-Bond Const. Co.* v.

---

[1]Plemmons Brothers Butane Company in Waldron had a similar arrangement with Beaird, but it is not now doing business.

*North Little Rock Elec. Co.,* 249 Ark. 389, 459 S. W. 2d 549.

In order to determine the correctness of the chancery court's action, we must decide whether the facts shown in support of appellee's motion made a prima facie case for recovery of the taxes paid by it. We find that they do not. Appellee failed to bring itself within the statute upon which it relies because it did not show that the *only* business activity on its behalf in Arkansas was the solicitation of orders. The stated purpose of the act in question was to prohibit states from collecting income taxes permitted by *Northwestern States Portland Cement Co.* v. *Minnesota* and *Williams* v. *Stockham,* 358 U. S. 450, 79 S. Ct. 357, 3 L. Ed. 2d 421, wherein it was held that mere solicitation of orders afforded sufficient "nexus" with the state in which they were solicited for such taxation. 2 U. S. Code Cong. & Adm. News 2548 et seq. (86th Cong., First Session, 1959). When we consider the purpose of the legislation and the language of the act, we cannot give the term "solicitation" the broad interpretation necessary to sustain this judgment. Other jurisdictions considering this section have held that "solicitation" is not to be given a broad construction. *Clairol, Inc.* v. *Kingsley,* 109 N. J. Super. 22, 262 A. 2d 213 (1970); *Cal-Roof Wholesale Co., Inc.* v. *State Tax Commission,* 242 Ore. 435, 410 P. 2d 233 (1966); *Herff-Jones Co.* v. *State Tax Commission,* 247 Ore. 404, 430 P 2d 998 (1967). The legislative history of the act clearly indicates that a narrow construction of the term "solicitation of orders" was intended by Congress. 2 U. S. Code Cong. & Adm. News 2548, et seq. (86th Cong., First Session, 1959).

The activities of appellee's representative in Arkansas go far beyond mere solicitation of orders for sales of appellee's products to be shipped into the state if the orders are approved. Proper performance of his duties requires him to make regular checks of customers' inventories of Beaird equipment. The record shows that Adams did so. This practice itself extends Beaird's activities beyond the scope of solicitation of orders. Even if it should be said that this activity helped to produce orders, it is

equally reasonable to conclude that Beaird's interest was in protecting its property rights in the items shipped to the various parties with whom it had contracts, to establish the basis for billing these parties and to determine whether conditions in any particular instances required invocation of rights reserved in the various contracts. If Beaird did not maintain this degree of control, then it would have had no means of determining whether or when it should bill a customer for a particular item or whether proper and timely remittances had been made by the customer.[2]

We would have no difficulty, however, in finding that appellee had failed to show, at least as a matter of law, that its activities were restricted to solicitation of orders for *sales* of tangible personal property. Appellant argues, with persuasive force, that the relationship between appellee and its "customers" is based upon a consignment arrangement, and that no sale is made by Beaird to them. Since the contracts might possibly be construed as being for conditional sales, in determining whether there was a sale or consignment we must look at the entire contract, as well as the actions of the parties thereunder. *Sternberg* v. *Snow King Baking Powder Co.,* 186 Ark. 1161, 57 S. W. 2d 1057; *American Snuff Co.* v. *Stuckey,* 197 Ark. 540, 123 S. W. 2d 1063. See also, *Ludvigh* v. *American Woolen Co.,* 231 U. S. 522, 34 S. Ct. 161, 58 L. Ed. 345 (1913); *Edgewood Shoe Factories* v. *Stewart,* 107 F. 2d 123 (5th Cir. 1939); *Liebowitz* v. *Voiello,* 107 F. 2d 914 (2nd Cir. 1939); *Reliance Shoe Co.* v. *Manly,* 25 F. 2d 381 (4th Cir. 1928).

Significant factors in evaluating such a transaction include:

1. Suggestion and contemplation of consignment in the memorandum of the agreement between the parties. [See *In re DIA Sales Corporation,* 339 F. 2d 175 (6th Cir. 1964).]

[2]We do not discuss the effect of "acceptance of payments" in Arkansas by appellee's representative because appellee asserted and appellant admitted in oral argument that this issue had not been raised in the trial court.

2. Lack of obligation on the part of the "consignee" to pay for unsold goods. [See *Ludvigh* v. *American Woolen Co.,* supra; *Fowler* v. *Pennsylvania Tire Company,* 326 F. 2d 526 (5th Cir. 1964); *In re DIA Sales Corporation,* supra.]

3. Obligation of the consignee to pay for goods when sold by him. [*Edgwood Shoe Factories* v. *Stewart,* supra.]

4. Prompt remittance to consignor for goods sold, whether for cash or credit. [See *Edgewood Shoe Factories* v. *Stewart,* supra.]

5. Visits to consignee to inquire into sales and urge prompt remittance of collections to consignor. [See *Ludvigh* v. *American Woolen Co.,* supra.]

6. Keeping by a representative of the consignor of an account or inventory of goods consigned and sold. [See *Ludvigh* v. *American Woolen Co.,* supra.]

7. Provision for return of merchandise upon termination of the agreement. [See *Ludvigh* v. *American Woolen Co.,* supra.]

In reviewing the contract and the actions of the parties here we note the following significant factors indicating that the arrangement was for consignment rather than sale:

1. The contracts use words consistent with consignment throughout,[3] *e.g.*:

a. First party shall *consign* to second party. . .

b. Second party agrees that no *consigned* systems will be used, sold or removed from its stocks. . .

c. Second party as *consignee,* especially as-

---

[3] It is notable that the words "sold" and "sale" are never used in connection with the transactions between Beaird and its "customers." They are only used in reference to transactions conducted by the "customers" in disposing of the goods.

sumes liability for and agrees to pay any state or local taxes levied on the *consigned* articles or their use and sale, or on the business growing out of *consignment* of said systems.

d. Second party agrees to use systems shipped into *consignment* on a first-in and first-out basis. . . and furthermore second party agrees to remit for all systems remaining in their *consigned* stock . . .

e. If Second party cancels the *consignment* agreement he agrees to (a) . . . or (b) deliver the stock remaining in *consignment* to another *consignment* . . . or (c) return the stock remaining in *consignment.*

2. The "customers" were only obligated to receive and accept *possession* of systems consigned upon the terms of the contract.

3. There is no obligation on the part of the "customer" to pay for consigned systems unless they remain in his consigned stock for more than 12 months, or unless they have been sold by him. He may, at his option *purchase* the remainder of stock on hand if he cancels the consignment agreement.

4. Parts cannot be removed from any system in stock without written approval of Beaird.

5. The "customer" is obligated to store the systems in a manner to hold them safe from fire, theft or other damages and to protect Beaird from liens or claims which may be asserted *against Beaird.*

6. If, in the opinion of Beaird, any of the systems are slow of movement, then at the *sole discretion of Beaird,* the "customer" shall make disposition of the systems in accordance with Beaird's written directions, with freight or hauling expense borne by Beaird.

7. The "customer" agrees not to stock or sell systems manufactured by others.

8. The "customer" agrees to "use" systems on a first-in, first-out basis to avoid obsolete inventory (in spite of the fact that he must pay for all systems remaining in the consigned stock over 12 months).

9. If the "customer" cancels the contract, he may either pay for the stock on hand, deliver the property remaining to another consignment at the direction of Beaird or return it to Beaird's factory at his own expense.

We do not intend to say that there are not other significant factors involved. It would not be unreasonable to infer from appellee's filing of tax returns and paying the taxes that it once thought that it was liable for them. Some of the actions of the parties are probably more consistent with a conditional sale than with consignment. We do mean to say that, at the very least, those factors pointed out suffice to raise a question of fact for the trial court's determination. Language from *In re Lexington Appliance Company, Inc.,* 202 F. Supp. 869 (D. C. Md. 1962) is appropriate here:

A consignment is generally defined as a bailment for care or sale, where there is no obligation to purchase on the part of the consignee. The presence or lack of an obligation to purchase or pay for the goods on the part of the consignee is the most important factor in determining whether the agreement may be termed a consignment, because, if the alleged consignee is absolutely bound in all events to pay for the goods unsold, even though title is reserved in the alleged consignor, the transaction is a sale, or at least a conditional sale.

Here the "customers" were never *absolutely bound in all events* to purchase any item. The contracts could easily be terminated before liability accrued for a system in stock for more than 12 months.

Since we cannot say that appellee was entitled to judgment on the record before us, as a matter of law, the judgment is reversed and the cause remanded for further proceedings.

JONES, J., dissents.